IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**ANTHONY CONNER,**                         Case Number 1:15 CV 2722

    Petitioner,                         Judge Donald C. Nugent

    v.                         REPORT AND RECOMMENDATION

**CHRISTOPHER LAROSE,**

    Respondent.                         Magistrate Judge James R. Knepp II

### INTRODUCTION

Anthony Conner, who is represented by counsel, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. 1). Respondent filed an answer (Doc. 17), Petitioner filed a reply (Doc. 19), and Respondent filed a sur-reply (Doc. 20). This cause is before the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) for findings of fact, conclusions of law, and recommendations. For the reasons stated below, the undersigned recommends the Petition be denied.

### FACTS

On September 19, 2012, a Cuyahoga County Ohio Grand Jury indicted Conner on one count of aggravated murder, one count of murder, four counts of felonious assault, one count of attempted murder, one count of discharging a firearm on or near a prohibited premises, and one count of having weapons under a disability. (Doc. 17-1, at 5–13). All counts, except for the having weapons under a disability count, included a one and a three year firearm specification. Conner, through counsel, pleaded not guilty on all counts. (Doc. 17-1, at 14).

The case was tried before a jury. At the close of the prosecution's case, Conner moved the

1

trial court to find him not guilty of all counts. (Doc. 17-8, at 36–38). The prosecution did not object to the dismissal of counts five (attempted murder) and six (felonious assault). (Doc. 17-8, at 38). The trial court subsequently dismissed those counts. (Doc. 17-8, at 38). The remaining counts went to the jury and the jury found Conner guilty of aggravated murder, murder, two counts of felonious assault, and discharge of firearm on or near a prohibited premises with the accompanying specifications. (Doc. 17-8, at 205–08). The jury found Conner not guilty of a felonious assault charge. (Doc. 17-1, at 151; Doc. 17-8, at 207). A bench trial was held regarding the weapons under a disability count for which the trial court found Conner guilty. (Doc. 17-8, at 213). On January 25, 2013, Conner received an aggregate sentence of life in prison, with the possibility of parole after 39½ years of incarceration. (Doc. 17-1, at 16–17; Doc. 17-8, at 245–48).

The Ohio Court of Appeals summarized the facts of the case as follows:

{¶ 2} On September 19, 2012, Conner was charged under a multi-count indictment as follows: (1) Count 1—aggravated murder of Damon D. Woodard; (2) Count 2—murder of Damon D. Woodard; (3) Count 3—felonious assault of Damon D. Woodard; (4) Count 4—felonious assault of Damon D. Woodard; (5) Count 5—attempted murder of Marquis Hollowell; (6) Count 6—felonious assault of Marquis Hollowell; (7) Count 7—felonious assault of Officer Nikolai Przybylski; (8) Count 8—discharge of firearm on or near prohibited premises; and (9) Count 9—having weapons while under disability. Count 9 was bifurcated and the remaining charges proceeded to a jury trial. All counts, with the exception of Count 9, included one-and three-year firearm specifications.

{¶ 3} Over the defense's objections, the trial court found Marquis Hollowell competent to testify. During the course of the proceedings, Conner moved for mistrial four times, all of which the trial court denied. The trial court granted Conner's Crim.R. 29 motion for acquittal on Counts 5 and 6 (attempted murder and felonious assault of Hollowell), and it denied his motion as to the remaining counts.

{¶ 4} The jury found Conner guilty of Counts 1, 2, 3, 4, and 8, and not guilty of Count 7. The court found Conner guilty of bifurcated Count 9. For sentencing purposes, Counts 2, 3, and 4 were merged with Count 1. The court imposed the following sentence:  life on Count 1 (with possible parole at 30 years); three years on the firearm specification; and six and one-half years on a probation violation on a different case. The court ordered this sentence to be served consecutively. The court sentenced Conner to eight years on Count 8 and three years on Count 9 and

ordered that sentence to be served concurrently. Conner is eligible for parole after 39½ years.

## SUBSTANTIVE FACTS

{¶ 5} Conner's convictions arose out of events that occurred following altercations at the Sirrah House, a nightclub with a history of fights, shots being fired, and assaults. The Cleveland nightclub, located on Lee Road, between Judson Drive and Lotus Drive, is routinely patrolled by Cleveland police officers. The following is a summary of the pertinent evidence the state presented at trial.

{¶ 6} On the evening of August 20, 2012, during routine patrol, Officers Antonio Curtis and Mister Jackson observed a fight break out at the entrance of the club within minutes of their arrival on the scene. The officers testified that it appeared that the club's security was attempting to push a large, fighting crowd out of the bar and away from the entrance. The officers attempted to disperse those who were involved in the multiple fights that had pervaded the Sirrah House parking lot and nearby streets. Due to the number of fights and the size of the crowd, Officer Curtis radioed for assistance. Officer Nikolai Przybylski and his partner, Officer Katrina Ruma, responded to the call for back-up.

{¶ 7} Officer Przybylski, responding to the call with lights and sirens activated, parked his patrol car near the intersection of Judson Drive and Lee Road. Officer Przybylski testified that upon his arrival, he witnessed a large amount of pedestrian and vehicular traffic in the area. He observed "at least a hundred" people on the scene who were "all over the place." He further stated that there was a lot of arguing and "[e]verybody was yelling at each other." Once the crowd began to clear, he observed a young, black male in a white t-shirt lying on the ground holding his head and another black male standing next to him, on the "edge of the driveway apron," wearing blue jeans and a long-sleeved red plaid shirt. Officer Przybylski testified that the red shirt stood out in his mind because it "seemed very strange" that someone was wearing a long-sleeved shirt in the summer.

{¶ 8} Officer Przybylski further testified as follows: The male with the red plaid shirt pulled a gun out of the waistband of his pants. Officer Przybylski saw the muzzle of the gun as the male with the red shirt pointed the gun in the direction of his zone car. The male then shot two to three times in the direction of his car. At the time, Officer Przybylski was still seated in his car, with the window down. Officer Przybylski stated that despite approximately "a dozen people meandering" between his car and the shooter, he had "a clear, unobstructed view" of the shooter and "no one was in [his] line of vision." Officer Przybylski stated that the commercial area was well lit and he was able to see the shooter's face and identify the gun as a .45–caliber "two-tone[d] * * * black and chrome or black and silver" handgun. Officer

Przybylski testified that it appeared that the shooter was looking at him and his partner and was shooting at them.

{¶ 9} When Officer Przybylski observed the shooter shooting in the direction of the patrol car, he removed his gun from his holster and exited his vehicle. While exiting the vehicle, Officer Przybylski, maintaining eye contact with the shooter, saw the shooter "pivot" and move from facing the officer to moving to the shooter's right. Officer Przybylski stated that he then saw the muzzle again come up and saw the shooter fire another three to four shots while facing north and west at an angle. He began to run towards the shooter. He stated that after the first round of shots, the crowd cleared considerably. He proceeded to chase the shooter. During the chase, he repeatedly yelled at the shooter to stop and drop the gun. He observed the shooter run in between cars, "dip [ ] down or crouch[ ] down" near a "dark-colored car" and "almost immediately pop[ ] back up" facing him. While continuing to chase the shooter, he saw the shooter's arms "coming up at the waist." Believing the shooter would shoot him, Officer Przybylski fired at him. Officer Przybylski testified that after he shot at the shooter, the shooter turned away from him and proceeded in a southeast direction toward Judson Drive, where the foot chase continued and Officer Przybylski fired a second shot at the shooter.

{¶ 10} Officer Curtis testified that he heard gunshots and proceeded toward the sound of the gunshots, where he observed Officer Przybylski chasing a male in the area of Judson Drive. He then joined Officer Przybylski in the pursuit. Officer Przybylski, seeing Officer Curtis approach, advised Officer Curtis that the male he was chasing was the shooter. Both officers observed the shooter run in between houses, and as they lost sight of him, they heard the rattling of a fence behind a house. They no longer heard the shooter's footsteps. The officers discovered the shooter lying between a fence and a garage, with his hands under his backside. Observing him rustle his hands under his backside, the officers yelled for the shooter to stop and to show his hands. Officer Przybylski picked up the suspect, and both officers handcuffed him. The officers found keys, a cell phone, and a driver's license on the ground where the shooter had been lying. They did not, however, find a gun. The officers later learned that a gun had been located.

{¶ 11} The officers placed the shooter under arrest. During that time, the shooter denied any involvement in the shooting. Rather, he stated that he had a twin wearing the exact same outfit—blue jeans and a red plaid long-sleeved shirt.

{¶ 12} Officer Przybylski positively identified Conner as the individual who fired shots at him shortly after he arrived on the scene and the same person who was carrying the handgun while running away from him. He also identified the state's exhibit Nos. 61 and 62, a red plaid shirt and a pair of blue jeans, with one hundred percent certainty, as the clothing the shooter was wearing that same evening. Officer Przybylski testified that he did not observe any other individual that evening wearing

4

anything similar to the red plaid shirt he identified as the shirt the shooter was wearing.

{¶ 13} Officers Daniel Dickens and Sarene Saffo, who also responded to the call for assistance at the Sirrah House, observed a parking lot full of cars and people on the sidewalk and crossing the street. They heard gunshots shortly after arriving on the scene. Both officers observed the shooter. Officer Dickens testified that he saw a black male with a short haircut, wearing a red, long-sleeved shirt, shooting northbound. Both officers identified state's exhibit No. 61 as the shirt the shooter was wearing on the evening in question. The officers also identified Conner as the shooter who was wearing that red, long-sleeved shirt. Officers Dickens and Saffo, who also joined in the chase with Officers Przybylski and Curtis, testified that they observed the shooter running in between the cars and then southbound to the sidewalk on Judson Drive. They stated that they only lost sight of the shooter for a brief moment when the shooter ducked down by a parked car, until he popped back up and continued to run out of the parking lot.

{¶ 14} Following the shooter's arrest, Officers Dickens and Saffo returned to the parking lot where they had last seen the shooter with a gun. They testified that they discovered a black and silver handgun on the ground in the parking lot where they had observed the shooter duck down between cars and pop back up. The officers identified state's exhibit No. 60, the .45 caliber Kimber semiautomatic firearm, as the gun that they discovered in the parking lot and the same one they saw the shooter running with and firing. Officer Przybylski also identified state's exhibit No. 60 as the gun he saw the shooter firing.

{¶ 15} Officer Ruma, who initially arrived on the scene with Officer Przybylski, heard gunshots while she attempted to control the large crowd that had dispersed throughout the streets and parking lots. She then observed Officer Przybylski exit the zone car and run towards Judson Drive. She radioed for back-up and exited the vehicle. She testified that while on the sidewalk just north of Judson Drive, she heard a second round of gunshots and observed Officers Przybylski, Dickens, and Saffo chasing a black male. Shortly thereafter, Officer Ruma observed a male who was bleeding from the chest lying on the ground of the parking lot near Lee Road, with an apparent gunshot wound. She called for an ambulance and attempted to provide some medical assistance to the victim. Officer Ruma testified that she and Officer Jackson also attempted to control a large, angry crowd that had surrounded them and the victim.

{¶ 16} The victim, identified as Damon D. Woodard, died from his injuries. Deputy medical examiner, Dr. Andrea McCollum, conducted the autopsy and concluded that Mr. Woodard died from multiple gunshots: one to his chest, one to his right arm, and one to his right knee. She recovered a bullet from a penetrating wound in Mr. Woodard's knee.

5

{¶ 17} Detective James Raynard collected several items from the crime scene, including the black and gray .45 caliber Kimber firearm and six .45 spent shell casings. He testified as to the locations throughout the parking lot and on the sidewalk where the shell casings were discovered. He stated that one of the casings was discovered on the south sidewalk of the parking lot near the driveway on Judson Drive. Detective Raynard also collected a suspected bullet fragment and scattered broken automobile glass located in and around a sport utility vehicle parked in the southwest corner of the parking lot.

{¶ 18} Detective Todd Clemens performed a gunshot residue test on Conner's hands and processed the firearm for fingerprints. No fingerprints, however, were found on the weapon. Forensic scientist Lisa Przepynszy analyzed the gunshot residue test and reported that no gunshot residue was found on Conner's hands. Ms. Przepynszy also collected gunshot residue samples from Conner's shirt and found no evidence of gunshot residue on the cuffs of Conner's shirt. Ms. Przepynszy testified that the absence of gunshot residue is indicative of an individual not having discharged a firearm; however, due to the ease with which gunshot residue can be removed or lost from a surface, a negative result can occur from circumstances such as washing, other contact with hands, wind, rain, running, or sweating.

{¶ 19} Ms. Przepynszy analyzed the victim's clothing for blood, defects indicating a bullet hole, and gunshot residue such as fouling and bullet wipe. State's exhibit No. 69 was identified as a yellow shirt belonging to Woodard and the state's exhibits Nos. 27 through 31 were identified as close-up photographs of Woodard's yellow shirt. In examining Woodard's shirt, Ms. Przepynszy determined that the muzzle to target distance was approximately two to four feet, an intermediate range.

{¶ 20} Detective James Kooser, an expert in firearms and toolmark examination, testified that he examined the .45 caliber Kimber firearm that was discovered from the crime scene and determined that the firearm was operable. He also examined the six spent cartridge casings collected from the crime scene. He determined that all six casings were fired from the .45 caliber Kimber firearm that was discovered at the scene. Finally, Detective Kooser examined the bullet that Dr. McCollum removed from the victim's knee during the autopsy, known as the morgue bullet. He determined that the morgue bullet was fired by the same .45 caliber Kimber pistol.

{¶ 21} Deandre Stephens, a friend of Conner's, testified that he has known Conner for approximately ten years and they are good friends. He testified that, on the night in question, he and Conner went to the Sirrah House. Stephens borrowed his girlfriend Erica Stevenson's blue Pontiac G6. Stephens testified that Conner drove the G6 to the Sirrah House and parked it in the parking lot on Lee Road. While at the Sirrah House, Stephens and Conner met up with Stephens's cousin, Sharda Elmore, and friends Jeremy Milner and Brandon Crawford.

6

{¶ 22} Stephens testified that a fight broke out at the Sirrah House and the club's disc jockey made them leave. He stated that he got in a car with Elmore, and Elmore began to drive away, but he stopped the car because he thought their friend Crawford had been shot. At this point, Stephens's testimony begins to conflict with the statements Stephens made during a police interview on August 21. The court granted the state's request to treat Stephens as a hostile witness.

{¶ 23} Brandon Crawford, a friend of Conner's, testified that he saw his friends, Elmore, Milner, and Conner at the Sirrah House. He stated that he "grew up with them" and knew them from the neighborhood. Crawford stated that while in the Sirrah House, a fight broke out in which someone swung at him. The fight continued outside of the club where Crawford "got hit with something," and someone "stomped [him] to sleep." Crawford testified that a friend then dragged him across the street and set him by a police car where he remained unconscious "for about five minutes." He further testified at trial that if someone were to fight him, his friends would help him.

{¶ 24} Sharda Elmore testified that Conner is "like a brother" to him, referring to him as "Ant." He and Conner have known each other throughout "childhood and adult life" from the neighborhood. Elmore testified that he was joining his friends, Conner, Crawford, Stephens, and Milner at the Sirrah House. He also testified that "the Benham boys" were fighting. He identified Marquis Hollowell as one of the Benham boys and stated that Hollowell has a "pending case" with his girlfriend.

{¶ 25} Elmore testified that he witnessed Hollowell and Milner "having words." He attempted to intervene and that is when the altercation escalated. Elmore stated that Hollowell and "six other guys" were in front of him in the bar, Milner and Crawford were standing on either side of him, and Conner, Stephens, and another friend were standing behind him. Following an exchange of words between Hollowell and Elmore, one of the Benham boys in a yellow shirt and dreads threw a punch at Elmore and they "got to tussling." Security then broke up the fight and escorted Hollowell's group outside, followed by Elmore and his group. Elmore testified that he and his friends were separated and he continued fighting in the parking lot with "some other guys" that were with Hollowell. He further testified that he was eventually surrounded by Hollowell and approximately 50 other people with Hollowell in the area when he saw Crawford lying on the ground hurt. Elmore was eventually smacked with a gun by one of the Benham boys and knocked unconscious. He was later treated for a broken jaw.

{¶ 26} Marquis Hollowell, a friend of Damon Woodard's, was present on the night in question and was interviewed by Detective Raymond Diaz on the scene and later at the police station. Hollowell had been declared incompetent to stand trial in his own defense on a different matter; however, following a competency hearing in this

7

matter, the trial court found him competent to testify.

{¶ 27} Detective Diaz testified that Hollowell made a spontaneous statement on the scene that Conner had shot Woodard. At trial, however, Hollowell claimed a complete lack of memory of the incident. He was therefore called as a court's witness. Hollowell's videotaped statement to Detective Diaz was played during his testimony for impeachment purposes.

{¶ 28} Divard Jones, the manager of the Sirrah House, was working the evening of August 20, 2012. He testified that on the night in question, there were two off-duty Cleveland police officers working security detail at the club. He further testified that, prior to entering the club, everyone is subject to a pat-down for weapons or potentially harmful objects by the officers working security at the door. Jones stated that he witnessed an altercation in the club around closing time and ushered the people outside, "contain[ing]" the inside of the club.

*State v. Conner*, No. 99557, 2014 WL 688606, at *1–6 (Ohio Ct. App. Feb. 20, 2014).

Conner raised the following issues in his direct appeal:

I. The trial court erred by denying Appellant's motion for a mistrial.

II. The trial court erred by finding Marquis Hollowell competent to testify, by finding him a hostile witness and by allowing the state to play Hollowell's prior recorded statements to the jury in violation of Appellant's due process right to a fair trial and his constitutional right to confrontation.

III. Appellant's convictions were not supported by sufficient evidence and the trial court erred by denying his motions for acquittal.

IV. The convictions were against the manifest weight of the evidence.

V. The improper comments made during closing arguments amounted to plain error and/or counsel's failure to object to them denied Appellant his constitutional right to effective assistance of counsel.

VI. The trial court erred by imposing consecutive sentences and by failing to merge all allied offenses of similar import.

*Id.* at *6.

The Ohio Court of Appeals affirmed Conner's conviction on February 20, 2014. *Id.* at *24.

Conner, proceeding *pro se*, then filed an appeal with the Supreme Court of Ohio arguing:

8

I. The Appellant, Anthony Conner, was denied his due process right to a fair trial as guaranteed by the fifth and fourteenth Amendments to the United States Constitution where the trial court denied his motion for mistrial which was grounded upon the trial court's erroneous admission of inadmissible and highly prejudicial evidence.

II. The trial court abused its discretion and the Appellant, Anthony Conner, was denied his due process right to a fair trial and his constitutional right to confrontation as guaranteed by the fifth, sixth and fourteenth Amendments to the United States Constitution where the trial court found Marquis Howell competent to testify, by finding Marquis Howell to be a hostile witness and by allowing the State to play Marquis Howell's prior recorded statements to the jury despite that face that Marquis Howell was unable to testify to those statements under oath during Appellant's trial so as to provide Appellant with an opportunity to cross-examine those prior recorded statements.

III. The Appellant's convictions are not supported by sufficient evidence, therefore, the Appellant has been denied his right to due process and equal protection of the laws as guaranteed by the fourteenth Amendment to the United States Constitution and the trial court erred when it denied his motion for acquittal.

IV. The Appellant's convictions are against the manifest weight of the evidence.

V. The state's comments made during closing arguments amounted to plain error and/or counsel's failure to object to them denied Appellant his constitutional right to the effective assistance of counsel.

VI. The trial court erred by imposing consecutive sentences and by failing to merge all allied offense of similar import.

(Doc. 17-1, at 155).

On June 11, 2014, the Supreme Court of Ohio declined to accept jurisdiction over the case.

(Doc. 17-1, at 172).

On May 21, 2014, Conner filed a *pro se* application to reopen his appeal with the Ohio Court of Appeals. (Doc. 17-1, at 173–214). He subsequently filed a supplement to his application. (Doc. 17-1, at 215–19). On October 22, 2014, the Ohio Court of Appeals denied Conner's application to reopen. (Doc. 17-1, at 232).

Conner then filed a *pro se* appeal with the Supreme Court of Ohio arguing: "When the State

improperly introduced evidence of the bad character of Appellant's friends to support the conviction it committed Prosecutorial Misconduct." (Doc. 17-1, at 253). On February 18, 2015, the Supreme Court Ohio declined to accept jurisdiction of the appeal. (Doc. 17-1, at 274).

On January 29, 2015, while his motion to reopen his appeal was pending before the appellate courts of Ohio, Conner filed a *pro se* motion with the trial court for leave to file a motion for a new trial under Ohio Crim. R. 33 (A)(6) and for an evidentiary hearing. (Doc. 17-1, at 275–85). Conner then filed a request to supplement his motion. (Doc. 17-1, at 286–301). On March 16, 2015, the trial court granted the motion to supplement and denied the motion for leave to file for a new trial.(Doc. 17-1, at 315–16). On March 20, 2015, Conner filed a request for a hearing on his motion for a new trail which the trial court denied. (Doc. 17-1, at 317–37).

Conner, through counsel, appealed the denial of his motion for a new trial. (Doc. 17-1, at 338–44). The Ohio Court of Appeals *sua sponte* dismissed the appeal as untimely filed. (Doc. 17-1, at 345). Conner then filed a motion for reconsideration. (Doc. 17-1, at 346–52). The court of appeals granted the motion construing it as a motion for a delayed appeal. (Doc. 17-1, at 353). In his brief, Conner argued: "Defendant was denied due process of law when he presented evidence of actual innocence without an evidentiary hearing." (Doc. 17-1, at 355). On January 28, 2016, the Ohio Court of Appeals affirmed the trial court's judgment. *State v. Conner*, No. 103092, 2016 WL 541477, at *9 (Ohio Ct. App. Jan. 28, 2016). Conner filed a motion for reconsideration which was denied. (Doc. 17-1, at 411–15, 420–22).

On April 18, 2016, Conner, through counsel, filed an appeal to the Supreme Court of Ohio (Doc. 17-1, at 423–24), arguing:

Defendant has been denied due process of law when he is not granted at least a hearing on a motion for leave to file a motion for new trial where a defendant has

> presented evidence for actual innocence, and the credibility of the affidavits cannot
> be reviewed or considered without an evidentiary hearing.

(Doc. 17-1, at 426). The Supreme Court of Ohio declined to accept jurisdiction over the case on June

29, 2016. *State v. Conner*, 52 N.E.2d 1205, 1205 (Ohio 2016) (table).

On December 31, 2015, Conner, through counsel, filed his habeas corpus petition with this

Court raising the following grounds for relief:

> Ground one: FOURTEENTH AMENDMENT
> Supporting Facts:  Petitioner was denied a fair trial. The trial court denied
> petitioner's request for a mistrial because of misconduct during the course of the
> trial.
>
> Ground two: SIXTH AND FOURTEENTH AMENDMENT
> Supporting Facts: Petitioner was denied his right of confrontation and
> cross-examination when the court allowed a prosecution witness, Marquis Hollowell
> to testify by allowing the state to play a prior recorded statement, not under oath, to
> the jury.
>
> Ground three: FOURTEENTH AMENDMENT
> Supporting Facts: Petitioner's conviction was not supported by evidence and proof
> beyond a reasonable doubt. Moreover, the convictions are against the manifest
> weight of the evidence entitling petitioner to a new trial.
>
> Ground four: FOURTEENTH AMENDMENT
> Supporting Facts: Petitioner was denied a fair trial because of improper comments
> made during closing arguments.
>
> Ground five: FIFTH AND FOURTEENTH AMENDMENT
> Supporting Facts: Petitioner was subjected to unconstitutional multiple punishments
> when the court failed to merge allied offenses of similar import.
>
> Ground six: SIXTH AMENDMENT
> Supporting Facts: Petitioner was denied effective assistance of counsel by reason of
> errors and omissions by his trial counsel.
>
> Ground seven: SIXTH AMENDMENT
> Supporting Facts: Petitioner was denied effective assistance of appellate counsel
> when appellate counsel failed to raise errors that were apparent upon the face of the

record.

### STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a district court cannot grant a habeas corpus petition with respect to any claim that was adjudicated on the merits in the state courts unless the adjudication resulted in a decision that: (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented to the state courts.  28 U.S.C. § 2254(d). Under the contrary to clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). Under the unreasonable application clause, a federal court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the petitioner's case. *Id*. at 413. To obtain habeas corpus relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

To analyze whether a state court decision is contrary to or an unreasonable application of clearly established Supreme Court precedent, courts look only to the holdings of the Supreme Court's decisions as of the time of the relevant state court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003). The state court's factual findings are presumed correct unless rebutted by the habeas corpus petitioner by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Moore v.*

*Mitchell*, 708 F.3d 760, 775 (6th Cir. 2013); *McAdoo v. Elo*, 365 F.3d 487, 493–94 (6th Cir. 2004).

## DISCUSSION

To facilitate the ease of discussion, Conner's six arguments will be individually analyzed.

*Ground One – Denial of Motions for a Mistrial*

Conner asserts that he was denied his right to a fair trial when the trial court overruled his requests for a mistrial. The Ohio Court of Appeals addressed this issue as follows:

{¶ 83} In his first assignment of error, Conner contends that the trial court erred by denying his motions for mistrial. On four occasions, Conner moved for mistrial: (1) When Officer Przybylski testified that an upset woman spontaneously exclaimed, "What did you do now?"; (2) Upon the circumstances surrounding the admission of Marquis Hollowell's videotaped interview with the police; (3) Upon the playing of Conner's videotaped interview with crime scene detectives during which Conner mentions a prior arrest; and (4) Upon the state's use of "consciousness of guilt" in closing arguments.

{¶ 84} The decision whether to grant or deny a motion for mistrial lies within the sound discretion of the trial court and will not be reversed absent a showing of an abuse of discretion. *Willis*, 8th Dist. Cuyahoga No. 99735, 2014–Ohio–114, ¶ 36, citing *State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995). A mistrial should not be ordered in a criminal case "merely because some error or irregularity has intervened, unless the substantial rights of the accused or the prosecution are adversely affected."*State v. Reynolds*, 49 Ohio App.3d 27, 33, 550 N.E.2d 490 (2d Dist. 1988). Rather, the granting of a mistrial is necessary only when "a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991).

**Officer Pzybylski's Testimony**

{¶ 85} Conner first moved for a mistrial during Officer Przybylski's testimony where the officer testified about a female approaching his zone car after he had secured Conner in the back seat. Initially, the trial court sustained defense counsel's objection, requiring the state to develop the officer's testimony. Officer Przybylski stated that the female, who claimed to be Conner's sister, was upset upon seeing Conner being placed under arrest:

> Q: And did you have the opportunity to speak with her?
> A: Yes.
> Q: What was her mood or demeanor while you spoke with her?
> A: She was upset that her brother was under arrest. Or who she claimed to be her brother. I don't know who she was.
> Q: * * * What led you to believe she was upset?

13

> A: The tone in her voice, her mannerisms.
> Q: Was she excited?
> A: Yeah.

{¶ 86} Following defense counsel's second objection, which was overruled, Officer Przybylski testified that when he told the woman that Conner was being arrested, she said to Conner, "What did you do now?" Following the officer's testimony, the defense moved for a mistrial, which the trial court denied.

{¶ 87} Conner argues that the trial court erred by allowing the introduction of the female's comment to Conner because it was hearsay. The state, on the other hand, claims that the "sister's" statement falls into the "excited utterance" exception to hearsay and was therefore admissible.

{¶ 88} Under Ohio Evid.R. 803(2), otherwise inadmissible hearsay is admissible if it is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Excited utterances are considered trustworthy because they are made while the event is still fresh in the declarant's mind. *State v. Fields*, 8th Dist. Cuyahoga No. 88916, 2007–Ohio–5060, ¶ 51, citing *State v. Taylor*, 66 Ohio St.3d 295, 300, 612 N.E.2d 316 (1993). The statement must concern "some occurrence startling enough to produce a nervous excitement in the declarant, which * * * the declarant had an opportunity to observe, and must be made before there had been time for such nervous excitement to lose domination over his reflective faculties." *State v. McCree*, 8th Dist. Cuyahoga No. 87951, 2007–Ohio–268, ¶ 60.

{¶ 89} We find that the above statement qualifies as an excited utterance and the state laid the proper foundation for the same. The "sister's" statement was made shortly after the incident and immediately upon the officer's placing Conner in his zone car, at which time the officer informed her that Conner was being placed under arrest. Her comment was made before there was sufficient time to reflect on the events. The trial court, therefore, did not err in admitting the woman's comment. The motion for mistrial was properly denied.

### Marquis Hollowell's Videotaped Interview

{¶ 90} Conner argues that the admission of Marquis Hollowell's videotaped interview with Detective Diaz was error and the admission deprived Conner of his right to a fair trial. We have previously determined that the trial court properly admitted Hollowell's videotaped interview for the impeachment of a court's witness. We therefore find no merit to Conner's argument.

### Conner's Videotaped Interview

{¶ 91} Conner moved for a mistrial when the trial court admitted Conner's videotaped interview with the crime scene detectives. Defense counsel specifically objected to the last portion of the videotape wherein Conner refers to the last time that he was arrested.

{¶ 92} This court has held that where a witness made an isolated reference to a defendant's criminal history and there was no showing that the defendant suffered material prejudice, a mistrial is not warranted. *See McCree*, 8th Dist. Cuyahoga No. 87951, 2007–Ohio–268. Where the reference to a defendant's prior arrests is "fleeting" and is followed by a curative instruction, "the trial court did not abuse its discretion in failing to order a mistrial." *State v. Garner*, 74 Ohio St.3d at 59, 656 N.E.2d 623.

{¶ 93} In this case, we do not find Conner's brief and isolated statement unfairly prejudicial so as to warrant a mistrial. Following defense counsel's objection, the court held a sidebar wherein the judge twice indicated that she did not understand what Conner had said. The prosecutor advised the court that the videotaped interview was a redacted version and that defense counsel had agreed to the redaction. Indicating that the omission was likely an oversight on the part of defense counsel, there was no prosecutorial misconduct, and the parties did agree to the redacted version, the court declined to order a mistrial and, rather, offered to give the jury a curative instruction. Not wishing to highlight the single comment, defense counsel declined the curative instruction.

{¶ 94} Under these circumstances, and in light of the overwhelming evidence presented in support of Conner's convictions, we cannot find that the arguably inaudible isolated comment referencing a prior arrest, without more, materially prejudiced Conner or interfered with his right to a fair trial. We find, therefore, that the trial court did not abuse its discretion in failing to order a mistrial following this remark. *See Garner* at 59, 656 N.E.2d 623.

15

**Consciousness of Guilt**

{¶ 95} Finally, Conner argues that the state's reference to Conner's "consciousness of guilt" deprived him of a fair trial such that a mistrial should have been granted.

{¶ 96} Generally, Ohio courts allow prosecutors considerable latitude in closing arguments, commenting freely on "what the evidence has shown and what reasonable inferences may be drawn therefrom." *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990), quoting *State v. Stephens*, 24 Ohio St.2d 76, 82, 263 N.E.2d 773 (1970). A prosecutor's comments should not be taken out of context; rather, courts must review the statement within the context of the entire trial. *State v. Williams*, 8th Dist. Cuyahoga No. 90739, 2012–Ohio–1741, ¶ 12.

{¶ 97} The trial court's control over the latitude afforded counsel during closing argument is discretionary and will not be overturned on appeal absent an abuse of discretion. *State v. Grice*, 8th Dist. Cuyahoga No. 97046, 2012–Ohio–1938, ¶ 32, citing *State v. Walters*, 9th Dist. No. 2775–M, 1998 Ohio App. LEXIS 4615, 1998 WL 668378 (Sept. 30, 1998).

{¶ 98} Here, viewing the comment in the context of the entire closing argument and the overwhelming evidence presented at trial, we cannot find that the prosecutor's reference to Conner's "consciousness of guilt" materially prejudiced Conner such that he was denied a fair trial. The prosecutor's comment preceded a recitation of the evidence presented at trial concerning Conner's actions after he fired the gun. The prosecutor is free to comment on what the evidence has shown and what reasonable inferences may be drawn therefrom. *Lott* at 165, 555 N.E.2d 293. As such, we cannot find that the trial court erred in not granting a mistrial following the prosecutor's comments regarding Conner's consciousness of guilt.

{¶ 99} Conner argues, alternatively, that the admission of the four statements referenced in this assignment of error amount to cumulative error and, therefore, Conner's convictions should be reversed. However, the doctrine of cumulative error is inapplicable when the alleged errors are found to be harmless or nonexistent. *Garner*, 74 Ohio St.3d at 64, 656 N.E.2d 623; *State v. Brown*, 100 Ohio St.3d 51, 2003–Ohio–5059, 796 N.E.2d 506, ¶ 48. Because we have found Conner's arguments with regard to his four motions for mistrial to be without merit, the cumulative error doctrine does not apply in this case. *See State v. Van Williams*, 8th Dist. Cuyahoga No. 94965, 2013–Ohio–4471.

{¶ 100} Conner's first assignment of error is overruled.

*Conner*, 2014 WL 688606, at *15–18.

A federal court's review of a trial court's decision to deny a mistrial is a  narrow one relating

to the petitioner's due process rights. *Zuern v. Tate*, 336 F.3d 478, 485 (6th Cir. 2003); *see also*, *Johnson v. Mitchell*, 585 F.3d 923, 937 (6th Cir. 2009). Reversal of the trial court's denial of a mistrial is warranted when the comment was potentially so misleading and prejudicial that it deprived the defendant of a constitutionally fair trial. *Zuern*, 336 F.3d at 485.

Conner has not met this standard. The opinion of the Ohio Court of Appeals establishes that the trial court's decision to deny Conner's four motions for a mistrial did not deprive him of a fair trial. The comments in question were not so misleading and prejudicial as to constitute a constitutional violation.

Further, a federal court may grant habeas corpus relief only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. 28 U.S.C. § 2254(d)(1); *Williams*, 529 U.S. at 412–13. Under this standard, Conner has not shown that the resolution of this claim by the Ohio Court of Appeals was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court; or was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412–13.

*Ground Two – Deprivation of Confrontation Rights*

Conner contends he was denied his right to confront and cross-examine prosecution witness Marquis Hollowell when the court allowed the state to play for the jury a prior recorded statement by Hollowell which was not under oath. In addressing this issue, the Ohio Court of Appeals stated:

> {¶ 42} Conner also argues that the trial court erred when it allowed the state to treat Hollowell as a hostile witness and allowed the state to play Hollowell's videotaped statement to the jury. We note, however, that the state did not treat Hollowell as a hostile witness. Rather, the court called Hollowell as a court's witness in accordance

17

with Evid.R. 614.

{¶ 43} Ordinarily, the credibility of a witness may be attacked by any party "except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage." Evid.R. 607(A). Under Evid.R. 614(A), the court may, "on its own or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called." In the event that the court calls a witness, however, the state may impeach the witness without demonstrating surprise. *State v. Stadmire*, 8th Dist. Cuyahoga No. 81188, 2003–Ohio–873, citing *State v. Dacons*, 5 Ohio App.3d 112, 449 N.E.2d 507 (10th Dist.1982), syllabus.

{¶ 44} This court has held that when a witness claims a complete lack of memory regarding the events described in a prior statement, the prior statement is considered inconsistent and is therefore admissible. *State v. Wilbon*, 8th Dist. Cuyahoga No. 82934, 2004–Ohio–1784, ¶ 26, citing *State v. Portis*, 10th Dist. Franklin No. 01AP–1458, 2002–Ohio–4501. In order to introduce a witness's prior inconsistent statement, a proper foundation must be laid. *Id*. at ¶ 26, citing *State v. Soke*, 105 Ohio App.3d 226, 663 N.E.2d 986 (8th Dist.1995). A proper foundation for the admission of extrinsic evidence of a prior inconsistent statement is made upon a witness stating that she did not recall making the prior statement. *See Portis*.

{¶ 45} In this case, Hollowell made a statement to the police following the shooting in which he identified Conner as the individual who shot Woodard. Prior to Hollowell testifying, the court held a competency hearing in order to determine whether he was competent to testify as a witness. During his competency hearing, Hollowell claimed that he no longer remembered the events of the night in question or making a statement to the police.

{¶ 46} The state then requested that the court call Hollowell as a court's witness under Evid.R. 614(A). After hearing arguments on the matter, the court agreed to call Hollowell as a court's witness and allowed both parties to cross-examine Hollowell as to his prior statements identifying Conner as the shooter. Upon cross-examination, Hollowell testified that he did not remember what happened on August 20, nor did he remember giving a statement to Detective Diaz. Thereafter, the state played Hollowell's videotaped interviews with Detective Diaz. When questioned about the statement, Hollowell again replied that he has no memory of the night Woodard was killed. In instructing the jury, the court advised the jury that Hollowell's videotaped interview is not to be considered as substantive evidence, but rather, it is for impeachment purposes only.

{¶ 47} In light of the foregoing, we find that the trial court properly called Hollowell as a court's witness and the state laid the proper foundation to impeach Hollowell's testimony based upon Hollowell's claim of a complete lack of memory regarding the

events of the night of August 20. The videotaped statement was inconsistent and therefore admissible under the circumstances. *Wilbon*, 8th Dist. Cuyahoga No. 82934, 2004–Ohio–1784, at ¶ 26. As such, the trial court did not err in allowing the state to play Hollowell's prior videotaped statement to the jury for purposes of impeaching Hollowell's credibility.

{¶ 48} Conner's second assignment of error is overruled.

*Conner*, 2014 WL 688606, at *9–10. The impeachment of Hollowell was addressed by the Ohio Court of Appeals pursuant to Ohio's Rules of Evidence and state law. Violations of state law or state procedures are not normally cognizable in habeas corpus proceedings. *Mijkovic v. Woods*, 517 F. App'x 392, 393 (6th Cir. 2013); *Brown v. McKee*, 460 F. App'x 567, 572 (6th Cir. 2012); *Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2010).

Conner has the right to impeach adverse witnesses in order "to show a prototypical form of bias on the part of witnesses, and thereby to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." *Blackston v. Rapelje*, 780 F.3d 340, 353 (6th Cir. 2015) (internal quotation marks and citations omitted). "A witness's own inconsistent statements, including recantations of prior inculpatory testimony, undeniably bear on a witness's bias and credibility . . . ." *Id.*

In this case, the trial court, as provided by Ohio's Rules of Evidence, called Hollowell as a court witness and allowed both parties to cross-examine Hollowell as to his prior statements identifying Conner as the shooter. Upon cross-examination, Hollowell testified that he did not remember what happened on August 20, nor did he remember giving a statement to the police.

The state played Hollowell's videotaped interviews with the police. When he was questioned about the statement, Hollowell again replied that he had no memory of the night Woodard was killed. The court instructed the jury that Hollowell's videotaped interview was not to be considered

as substantive evidence, but rather, it was only for impeachment purposes. *Conner*, 2014 WL 688606, at *9.

The trial court's procedure did not deprive Conner of his right to confront and cross-examine Hollowell. Further, Conner has not established under the *Williams* standard that the decision of the Ohio Court of Appeals on this issue was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court; or was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412–13.

*Ground Three – Sufficiency and Manifest Weight of the Evidence*

In his third ground of relief, Conner claims his convictions were not supported by the evidence and proof beyond a reasonable doubt. He further argues the convictions are against the manifest weight of the evidence entitling him to a new trial.

In his habeas corpus petition, Conner fails to explain why his convictions are against the manifest weight of the evidence. In his traverse and brief, Conner still fails to discuss how his convictions were against the manifest weight of the evidence. Rather, his argument in his traverse concerns the insufficiency of the evidence to support his convictions beyond a reasonable doubt. (Doc. 19, at 16). "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (citations omitted).

Furthermore, Conner's claim is not cognizable in a federal habeas corpus proceeding and is not reviewable by this Court because "[a] 'manifest weight of evidence' claim, which is based on

a state law concept that 'is both quantitatively and qualitatively different' from a constitutional due process sufficiency of evidence standard, raises an issue of state law only." *Ladd v. Tibbals*, No. 5:11-cv-00173, 2012 WL 5364242, at *7 (N.D. Ohio Sept. 11, 2012); *Brown v. Moore*, No. 1:06-CV-00413, 2008 WL 4239160, *8 (S.D. Ohio 2008) (citing 28 U.S.C. § 2254(a); *Pulley v. Harris*, 465 U.S. 37, 41 (1998)).

Regarding Conner's sufficiency of the evidence claim, a federal court is bound by two layers of deference. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). This standard is even more exacting in a habeas corpus proceeding because this Court's review of the Ohio Court of Appeals's decision on the merits of this issue must be done through the deferential standard of the AEDPA. *Hill v. Mitchell*, 842 F.3d 910, 933 (6th Cir. 2016). Even if this Court were to "conclude that a rational trier of fact could *not* have found the petitioner guilty beyond a reasonable doubt, on habeas review, [the Court] must still defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009) (emphasis in original).

In summarizing this issue, the Ohio Court of Appeals explained:

{¶ 49} In his third assignment of error, Conner contends that the trial court erred in denying his Crim.R. 29(A) motion for acquittal because there was insufficient evidence that he committed aggravated murder, murder, and felonious assault of Damon Woodard.

{¶ 50} A Crim.R. 29(A) motion challenges the sufficiency of the evidence. When reviewing a challenge of the sufficiency of the evidence, an appellate court examines the evidence admitted at trial and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the

syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id*. A sufficiency challenge requires us to review the record to determine whether the state presented evidence on each of the elements of the offense. *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

**Aggravated Murder**

{¶ 51} Conner contends that there was insufficient evidence of prior calculation and design in order to support his conviction for aggravated murder.

{¶ 52} R.C. 2903.01(A) provides that "[n]o person shall purposely, and with prior calculation and design, cause the death of another * * *." A person acts purposely when it is his specific intent to cause a certain result. R.C. 2901.22(A).

{¶ 53} "Prior calculation and design" indicates "'studied care in planning or analyzing the means of the crime as well as a scheme encompassing the death of the victim.'" *State v. Hill*, 8th Dist. Cuyahoga No. 98366, 2013–Ohio–578, ¶ 20, quoting *State v. Taylor*, 78 Ohio St.3d 15, 19, 676 N.E.2d 82 (1997). The scheme must be "'designed to implement the calculated decision to kill.'" *State v. D'Ambrosio*, 67 Ohio St.3d 185, 196, 616 N.E.2d 909 (1993), quoting *State v. Cotton*, 56 Ohio St.2d 8, 11, 381 N.E.2d 190 (1978). Prior calculation and design can be found even when a plan to kill is quickly conceived and executed within minutes. *State v. Coley*, 93 Ohio St.3d 253, 264, 754 N.E.2d 1129 (2001). A momentary impulse, however, is insufficient. *See State v. Conway*, 108 Ohio St.3d 214, 2006–Ohio–791, 842 N.E.2d 996.

{¶ 54} The existence of prior calculation and design is determined on a case-by-case analysis of the facts and the evidence. *Hill* at ¶ 21, citing *State v. Jones*, 91 Ohio St.3d 335, 345, 744 N.E.2d 1163 (2001). The facts of a particular case can demonstrate that the defendant had adopted a plan to kill. *Conway* at ¶ 46.

{¶ 55} In determining whether a defendant acted with prior calculation and design, the Ohio Supreme Court has delineated three factors a court should consider:

> (1) Did the accused and victim know each other, and if so, was that relationship strained?

> (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and

(3) Was the act drawn out or "an almost spontaneous" eruption of events?

*State v. Bolan*, 8th Dist. Cuyahoga No. 95807, 2011–Ohio–4501, ¶ 14, quoting *Taylor* at 19, 676 N.E.2d 82; *State v. Jenkins*, 48 Ohio App.2d 99, 355 N.E.2d 825 (8th Dist. 1976). These factors "must be weighed together and viewed under the totality of all circumstances of the homicide." *Jenkins* at 102, 355 N.E.2d 825.

{¶ 56} Here, the evidence presented at trial sufficiently supports the jury's determination of prior calculation and design. The evidence demonstrates that there was a strained relationship between Conner's group of close friends (Stephens, Milner, Crawford, and Elmore) and Marquis Hollowell's group (identified as the Benham boys and includes the victim, Damon Woodard). Elmore testified that Hollowell has a "pending case" with Elmore's girlfriend. The record shows that fighting ensued between the two separate groups, following a heated exchange of words between them, for which Conner was present. Elmore testified that one of the Benham boys in a yellow shirt and dreads threw a punch at him. The evidence shows that Woodard, a friend of Hollowell, was wearing a yellow shirt. Both Crawford and Elmore were injured during the fighting.

{¶ 57} The evidence also shows that Conner gave thought in choosing a murder weapon. Divard Jones, the manager of the Sirrah House, testified that every person who enters the club is subject to a pat-down for weapons prior to entering the club. It is reasonable to believe that Conner did not have a weapon on his person while he was inside the club. At some point after the altercation inside the club and after he and his group of friends were ushered outside, Conner made the deliberate decision to retrieve a gun in order to shoot Woodard.

{¶ 58} Finally, the evidence shows that Conner's actions went beyond a momentary impulse, showing that he had formulated a plan to kill. Officer Przybylski, upon his arrival on the scene, observed Conner standing next to a young, black male in a white t-shirt lying on the ground holding his head. He then saw Conner point the gun in the direction of his zone car and shoot two to three times in the direction of his car. While exiting his vehicle, Officer Przybylski observed Conner "pivot" and move from facing him to moving to Conner's right and shooting another three to four shots. This evidence is sufficient to show that Conner made a deliberate decision to fire two rounds of shots and he strategically positioned himself to carry out his plan.

{¶ 59} Although rather quickly conceived and executed in a short period of time, a rational trier of fact could have concluded beyond a reasonable doubt that Conner had formulated a plan to kill Woodard in retaliation for injuring a close friend. There is sufficient evidence to show that, after observing the altercation between his close friends and the Benham boys inside the Sirrah House and in the parking lot, and after

23

observing Crawford's injuries, Conner retrieved a gun and, with prior calculation and design, decided to shoot Woodard.

**Felony Murder and Felonious Assault**

{¶ 60} Conner contends that there was insufficient evidence to support his conviction for murder because there was insufficient evidence that he committed the predicate offense of felonious assault. He further contends that there was no evidence that Conner knowingly caused or attempted to cause physical harm to Damon Woodard with a deadly weapon. In support of his argument, Conner claims that there was a large, aggressive crowd and a chaotic scene, during which no one actually witnessed him shoot at anyone or anything in particular.

{¶ 61} Under R.C. 2903.02(B), felony murder, "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree." In this case, the underlying felony giving rise to the felony murder is the felonious assault against Damon Woodard.

{¶ 62} Under R.C. 2903.11(A)(1), felonious assault, "[n]o person shall knowingly * * * [c]ause serious physical harm to another."  R.C. 2903.11(A)(2) provides that "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." An individual "acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶ 63} It is common knowledge that a firearm is an inherently dangerous instrumentality, the use of which is reasonably likely to produce serious injury or death. *State v. Willis*, 8th Dist. Cuyahoga No. 99735, 2014–Ohio–114, ¶ 25, citing *State v. Widner*, 69 Ohio St.2d 267, 270, 431 N.E.2d 1025 (1982). Moreover, "shooting a gun in a place where there is risk of injury to one or more persons supports the inference that the offender acted knowingly." *State v. Hunt*, 8th Dist. Cuyahoga No. 93080, 2010–Ohio–1419, ¶ 19, citing *State v. Brooks*, 44 Ohio St.3d 185, 192, 542 N.E.2d 636 (1989).

{¶ 64} Here, the state offered overwhelming evidence that Conner fired the shots that struck and killed Damon Woodard. Officer Przybylski testified that he observed a male with a long-sleeved, red shirt pull a gun out of the waistband of his pants, point the gun in the direction of his zone car, and fire two to three shots in his direction. He then witnessed the shooter pivot, slightly changing his direction, and shoot another three to four shots. Officer Przybylski positively identified Conner as the individual who fired shots and the same person who was carrying the handgun while

running away from him. He also identified the state's exhibit Nos. 61 and 62, a red plaid shirt and a pair of blue jeans, with one hundred percent certainty, as the clothing the shooter was wearing that same evening.

{¶ 65} Officers Dickens and Saffo also identified Conner as the shooter. They identified state's exhibit No. 61 as the shirt the shooter was wearing on the evening in question. Officers Dickens, Saffo, and Przybylski testified that they only lost sight of the shooter for a brief moment, when the shooter ducked down briefly by a parked car and popped back up and continued to run. Officers Dickens and Saffo recovered a .45 caliber Kimber semiautomatic firearm, state's exhibit No. 60, from the location where the shooter had momentarily ducked down. All three officers identified state's exhibit No. 60 as the gun they saw Conner firing.

{¶ 66} Finally, ballistics evidence showed that the .45 caliber Kimber firearm that was discovered at the crime scene was operable and the six spent cartridge casings collected from the scene were fired from the .45 caliber Kimber firearm. Detective Kooser testified that the morgue bullet that was removed from Woodard's body was fired by the same .45 caliber Kimber pistol.

{¶ 67} In light of the above, after viewing the evidence in a light most favorable to the prosecution, we conclude that any rational trier of fact could have found the essential elements of aggravated murder, murder, and felonious assault proven beyond a reasonable doubt.

{¶ 68} Conner's third assignment of error is overruled.

*Conner*, 2014 WL 688606, at *10–13.

In applying the deference standards discussed in *Jackson*, *Hill*, and *Brown*, Conner is not entitled to habeas corpus relief based on his sufficiency of the evidence argument. The Ohio Court of Appeals described in great detail the facts which supported Conner's convictions for aggravated murder, felony murder, and felonious assault. The court noted the applicable state law for each of those offenses. The court of appeals's summation of the facts for each charge establishes that a "rational trier of fact could have found the essential elements of [each] crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. Under the AEDPA standard of review, this Court must defer to the Ohio Court of Appeals regarding its sufficiency of the evidence determination because the

decision is reasonable. *Brown*, 567 F.3d at 205. Therefore, Conner's third argument is without merit.

*Ground Four – Improper Closing Argument*

In his fourth claim for relief, Conner contends that he was denied his right to a fair trial because of improper comments made by the prosecution during closing arguments. In his return to the writ, Respondent speculates that this claim relates to a "lying felons" comment made by the prosecution. (Doc. 17, at 47). In his traverse, Conner confirms that the "lying felons" remark is the comment which he believes denied him a fair trial. Conner is not entitled to habeas corpus relief on this issue for two reasons.

First, in his traverse, Conner relies on two decisions by the state appellate courts of Ohio to support his position. As previously noted, violations of state law or state procedures are not normally cognizable in habeas corpus proceedings. *Mijkovic*, 517 F. App'x at 393; *Brown*, 460 F. App'x at 572; *Moreland*, 699 F.3d 923.

Second, the issue is procedurally defaulted. In his brief on direct appeal, Conner asserted he was denied effective assistance of counsel when counsel failed to make an objection to improper remarks made during closing arguments which prejudiced Conner and deprived him of a fair trial. (Doc. 17-1, at 23, 58–60). This is not the same argument which Conner presents in his habeas corpus petition.

Before seeking a writ of habeas corpus in federal court, a petitioner must first exhaust his state court remedies before a federal court can grant relief on a constitutional claim. 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 844–45 (1999). This requirement is designed to give state courts the initial opportunity to pass upon and, if necessary, correct errors of federal law

in a state prisoner's conviction or sentence. *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995); *Picard v. Connor*, 404 U.S. 270, 275–76 (1971). "The purpose of exhaustion is not to create a procedural hurdle on the path to federal habeas court, but to channel claims into an appropriate forum, where meritorious claims may be vindicated and unfounded litigation obviated before resort to federal court." *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 10 (1992).

To properly exhaust state remedies, the petitioner must "fairly present" a claim in each of the appropriate state courts, including a state supreme court, in a procedurally appropriate manner. *O'Sullivan*, 526 U.S. at 845. In Ohio, this requires direct and delayed appeals to the Ohio Court of Appeals and the Supreme Court of Ohio. *See Allen v. Perini*, 424 F.2d 134, 140 (6th Cir. 1970).

As the Supreme Court noted in *Picard*,

> If the exhaustion doctrine is to prevent unnecessary conflict between courts equally bound to guard and protect rights secured by the Constitution, it is not sufficient merely that the federal habeas applicant has been through the state courts. The rule would serve no purpose if it could be satisfied by raising one claim in the state courts and another in the federal courts. Only if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding does it make sense to speak of the exhaustion of state remedies. Accordingly, we have required a state prisoner to present the state courts with the same claim he urges upon the federal courts.

*Picard*, 404 U.S. at 275–76 (internal quotation marks and citations omitted).

"It is not enough that all the facts necessary to support the federal claim were before the state courts, . . . ." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (citations omitted). The legal and factual "substance" of the federal claim must have been presented to the state courts. *Id*.

The failure to properly present a federal ground to the state courts constitutes procedural default or waiver barring federal habeas corpus review. *Gray v. Netherland*, 518 U.S. 152, 161–62 (1996). When the petitioner fails to fairly present to the state courts the claim on which he seeks

27

relief in federal court, and the opportunity to raise that claim in state court has passed, the petitioner has procedurally defaulted that claim. *O'Sullivan*, 526 U.S. at 853–54.

A habeas corpus petitioner procedurally defaults a claim if:

(1) the petitioner fails to comply with a state procedural rule; (2) the state courts enforce the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (4) the petitioner cannot show cause and prejudice excusing the default.

*Guilmette v. Howes*, 624 F.3d 286, 290 (6th Cir. 2010) (citations omitted); *see also Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

The "cause" standard in procedural–default cases requires a petitioner to show that "some objective factor external to the defense" impeded his efforts to raise a claim in the state courts. *McCleskey v. Zant*, 499 U.S. 467, 493 (1991) (internal quotation marks omitted). Such factors may include interference by officials, an attorney error rising to the level of ineffective assistance of counsel, or a showing of a factual or legal basis for a claim that was not reasonably available. *Id.* at 493–94.

Because Conner did not present his improper comment argument before the state courts of Ohio in his direct appeal, and the time for him to do so has now passed, the the issue is deemed not to have been properly exhausted for federal habeas corpus review. *Goldberg v. Maloney*, 692 F.3d 534, 538 (6th Cir. 2012). Further, Conner has not established cause and prejudice to excuse the default, *Maupin*, 785 F.2d at 138, nor has he shown the alleged constitutional violation "probably resulted in the conviction of one who is actually innocent . . . ." *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

*Ground Five – Failure to Merge Allied Offenses*

Conner contends he was subjected to unconstitutional multiple punishments when the trial court failed to merge allied offenses of similar import. Conner does not elaborate regarding this claim in his habeas corpus petition. In his traverse, Conner's counsel ignores this claim and argues that the "prosecution engage[d] in a series of misconduct." (Doc. 19, at 17).

As previously explained, "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *McPherson*, 125 F.3d at 995–96. Conner's failure to develop and explain the fifth claim for relief constitutes a waiver of this claim. *Id*.

In his appeal before the Ohio Court of Appeals, Conner presented the issue under Ohio law (Doc. 17-1, at 60–62), and was addressed as such by the court. *Conner*, 2014 WL 688606, at *20–24. This Court may not issue the writ of habeas corpus on the basis of perceived errors of state law. *Floyd v. Alexander*, 148 F.3d at 615, 619 (6th Cir. 1998).

Finally, Conner's brief before the Ohio Court of Appeals establishes that he failed to raise sufficient facts to support a federal claim. *Anderson*, 459 U.S. at 6. Because Conner failed to present his argument as a federal constitutional claim, not merely as an issue arising under state law, the argument is procedural defaulted. *Gray*, 518 U.S. at 161–62; *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987); *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984). Conner has not established cause and prejudice to excuse this procedural default, *Maupin*, 785 F.2d at 138, and he has not established that this alleged constitutional violation probably resulted in the conviction of an innocent individual. *Murray*, 477 U.S. at 496.

*Ground Six – Ineffective Assistance of Trial Counsel*

Conner contends that he was denied effective assistance of trial counsel. In his traverse, Conner states: "[t]here were numerous errors and omissions by defense counsel during the course of the trial, along with a failure to object to obvious improper statements or evidence, which deprived petitioner a fair trial." (Doc. 19, at 17–18). The only specific fact which Conner notes as the basis for his claim is as follows:

> Counsel was less than diligent in not objecting to comments on the credibility of witnesses. When the prosecutor claimed at trial that these were **"lying felons."** (Tr. 1448, 1501). The prosecutor may not claim that one witness as opposed to another witness is more credible nor a belief that a witness is telling the truth. Thus, there should have been an objection and the failure to do so in this case, which was not overwhelming so far as the evidence was concerned, deprived petitioner of his Sixth Amendment right to effective assistance of counsel.

(Doc. 19, at 18).

Conner's reference to "numerous errors and omissions" is vague. These perfunctory claims are deemed waived because it is not this Court's responsibility to determine the basis of these references. *McPherson*, 125 F.3d at 995–96. The only incident, therefore, which constitutes the basis for Conner's ineffective assistance of trial counsel claim is counsel's failure to object to the prosecutor's reference to "lying felons."

To establish ineffective assistance of counsel, a petitioner must show both that counsel's performance was deficient and that the deficient performance resulted in prejudice to the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. The deferential standards established by *Strickland* and § 2554(d) make habeas review of ineffective-assistance claims "doubly" deferential. *Harrington v. Richter*,

30

562 U.S. 86, 105 (2011). When a case is governed by § 2254(d), "the question is not whether counsel's actions were reasonable . . . [but] whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id*.

In addressing this issue, the Ohio Court of Appeals stated:

{¶ 101} In his fifth assignment of error, Conner argues that his convictions should be overturned because he was denied the effective assistance of counsel. Conner contends that his trial counsel's failure to object to the prosecutor's remark in closing arguments during which he referred to Conner's witnesses as "lying felons" was plain error and counsel's failure to object denied him the effective assistance of counsel.

{¶ 102} In order to establish a claim of ineffective assistance of counsel, a defendant must demonstrate: (1) his counsel was deficient in some aspect of his representation, and (2) the deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed. 2d 674 (1984).

{¶ 103} The first element requires a showing that counsel made errors "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. It necessarily requires that when a defendant complains of the ineffectiveness of counsel's assistance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id*. at 687–688.

{¶ 104} Regarding the second element, the defendant must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Bradley*, 42 Ohio St.3d at 142, 538 N.E.2d 373, citing *Strickland* at 694. Moreover, a defendant's failure to satisfy one element of the *Strickland* test negates the court's need to consider the other. *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000), citing *Strickland* at 697.

{¶ 105} As we have previously said, courts allow prosecutors considerable latitude in closing arguments. *Lott*, 51 Ohio St.3d at 165, 555 N.E.2d 293. Nevertheless, they must "avoid insinuations and assertions calculated to mislead" and they may not express their personal beliefs or opinions regarding the guilt of the accused or allude to matters not supported by the evidence. *Id*. at 166, 555 N.E.2d 293. Prosecutors may, however, fairly comment on the credibility of witnesses based on the witnesses' testimony at trial. *Williams*, 8th Dist. Cuyahoga No. 90739, 2012–Ohio–1741, at ¶ 12. In that regard, courts must review the prosecutor's statement within the context of the entire trial, rather than take the comments out of context and give them their most damaging meaning. *Id*., citing *State v. Hill*, 75 Ohio St.3d 195, 204, 661 N.E.2d

1068 (1996).

{¶ 106} In reviewing a claim of prosecutorial misconduct, we must determine whether the comments and questions by the prosecution were improper and, if so, whether they prejudiced appellant's substantial rights. *State v. Smith*, 14 Ohio St.3d 13, 14–15, 470 N.E.2d 883 (1984). An appellate court should only reverse a conviction if the effect of the misconduct "'permeates the entire atmosphere of the trial.'" *State v. Gibson*, 8th Dist. Cuyahoga No. 98725, 2013–Ohio–4372, ¶ 99, quoting *State v. Tumbleson*, 105 Ohio App.3d 693, 699, 664 N.E.2d 1318 (12th Dist. 1995). "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Gapen*, 104 Ohio St.3d 358, 2004–Ohio–6548, 819 N.E.2d 1047, ¶ 92, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S. Ct. 940, 71 L.Ed. 2d 78 (1982).

{¶ 107} In this case, during closing arguments, the prosecutor made two comments that impugn the credibility of certain witnesses. Referring specifically to Deandre Stephens, a friend of the defendant, the prosecutor stated, "God knows Deandre Stephens is not the person I would choose to testify in my case * * *. If it was up to me and I can choose my witnesses, I wouldn't bring in lying felons * * *." Thereafter, the prosecutor referred to witnesses Brandon Crawford, Sharda Elmore, Jeremy Milner, and Stephens as Conner's "lying friends."

{¶ 108} While we find the prosecutor's statements to be somewhat troubling, and seemingly evident of his opinion that Conner's friends lied, we cannot say that these isolated comments deprived Conner of a fair trial. We consider these remarks in the context of the entire closing argument. In that regard, the prosecutor told the jury, alongside the alleged improper comments, that he disagrees with the defense's assessment of the credibility of the witnesses. He then reminded the jury of its role in deciding credibility and he specifically asked the jury to consider the evidence in deciding witness credibility:

> I'm not going to ask you to go back and find [Conner] guilty. I'm going to ask you to go in the back and talk about the witnesses who testified and talk about the evidence that was presented and reach a fair decision so that the state has been treated fairly and that the defendant has been treated fairly and that your verdict reflects the evidence and how it applies to these charges.

Finally, the prosecutor asked the jury to think about what it heard in the courtroom along with the context of the testimony and the conduct of the witnesses. When considered in this context, we do not believe the prosecutor's two comments would unduly influence the jury.

{¶ 109} Additionally, the court specifically instructed the jury as follows: (1) the

jury was the sole judge of the facts and the credibility of the witnesses and the weight to be given to the testimony of each witness; and (2) opening and closing statements do not constitute evidence. We have no basis to conclude that the jury did not follow the court's instructions.

{¶ 110} Having found that the prosecutor's remarks would not have changed the outcome of the trial, we cannot say that Conner was prejudiced by his defense counsel's failure to object. Conner's ineffective assistance of counsel claim therefore fails, and his fifth assignment of error is overruled.

*Conner*, 2014 WL 688606, at *18–20.

A federal court may grant habeas corpus relief only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. 28 U.S.C. § 2254(d)(1); *Williams*, 529 U.S. at 412–13. Conner has not shown that the resolution of his ineffective assistance of trial counsel argument by the state courts of Ohio met this standard. 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412–13.

The Ohio Court of Appeals examined Conner's claim under the *Strickland* standard. In applying the Supreme Court's decision in *Smith*, the court of appeals explained its analysis focused on the fairness of the trial and not the culpability of the prosecutor. *Conner*, 2014 WL 688606, at *19 (citing *Smith*, 455 U.S. at 219). The court reviewed the comments in the context of the entire trial and found that the remarks would not have changed the outcome of the trial. *Conner*, 2014 WL 688606, at *18–20. The court's analysis is reasonable and under *Williams*, does not entitle Conner to habeas corpus relief.

*Ground Seven – Ineffective Assistance of Appellate Counsel*

In his seventh ground for relief, Conner claims: "Petitioner was denied effective assistance of appellate counsel when appellate counsel failed to raise errors that were apparent upon the face

33

of the record." As Respondent notes, this statement "could mean just about anything." (Doc. 17, at 66). These vague and perfunctory claims are deemed waived. *McPherson*, 125 F.3d at 995–96. However, in the interest of justice, and because they are the only issues which are preserved for habeas corpus review, the Court will assume that Conner is raising the same grounds for ineffective assistance of appellate counsel as he presented in his Rule 26(B) application to the Ohio Court of Appeals. *State v. Conner*, No. 99557, 2014 WL 5387944, at *1 (Ohio Ct. App. Oct. 22, 2014).

In his Rule 26(B) application, Conner argued: "his appellate counsel was ineffective because he did not argue (1) that the trial court erred in failing to suppress a suggestive pretrial identification, and (2) that the prosecutor used perjured evidence and an improper argument to secure the conviction." *Id*. After again setting forth the *Strickland* standard for ineffective assistance of counsel claims, the Ohio Court of Appeals explained:

> {¶ 4} Specifically, in regard to claims of ineffective assistance of appellate counsel, the United States Supreme Court has upheld the appellate advocate's prerogative to decide strategy and tactics by selecting what he thinks are the most promising arguments out of all possible contentions. The court noted: "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Jones v. Barnes*, 463 U.S. 745, 751–752, 103 S. Ct. 3308, 77 L.Ed. 2d 987 (1983). Indeed, including weaker arguments might lessen the impact of the stronger ones. Accordingly, the court ruled that judges should not second-guess reasonable professional judgments and impose on appellate counsel the duty to raise every "colorable" issue. Such rules would disserve the goal of vigorous and effective advocacy. The Supreme Court of Ohio reaffirmed these principles in *State v. Allen*, 77 Ohio St.3d 172, 672 N.E.2d 638 (1996).

*Id*.

In addressing the first issue, the court stated:

> {¶ 9} In his first argument, Conner submits that his appellate counsel should have argued that the trial court erred in failing to suppress this suggestive pretrial identification. Conner argues that showing a witness a single photograph is highly suggestive and creates a very substantial likelihood of misidentification. *State v.*

34

*Battee*, 72 Ohio App.3d 660, 595 N.E.2d 977 (11th Dist.1991). He further notes that the single photograph procedure is counter to the eyewitness identification procedures specified in R.C. 2933.83.

{¶ 10} This argument is not well-founded. First, the trial judge need not have suppressed this "identification" because it was not offered as substantive evidence but for purposes of impeachment or refreshing memory. This court further notes that neither *Battee* nor R.C. 2933.83 prohibit other means of identification, if the totality of the circumstances indicate that the identification was reliable.

{¶ 11} Moreover, appellate counsel continued the trial strategy that playing Hollowell's interview was grounds for a mistrial. In this, he made the playing of the recording part of a larger argument that the admission of other acts evidence and prosecutorial misconduct demanded a mistrial. Appellate counsel emphasized in this assignment of error that playing the recording was prejudicial to Conner and denied him his right to confrontation and to a fair trial. Appellate counsel focused on the interview in the second assignment of error that the trial court erred in allowing Hollowell to testify and in allowing the state to play the recorded interview. Appellate counsel argued that the interview was improperly proffered for impeachment purposes because there was nothing to impeach. Hollowell's lack of memory did not contradict his earlier statements; he just could not remember them. Furthermore, allowing the jury to hear Hollowell identify Conner as the shooter was material and irreparable prejudice. Following the admonitions of the United States Supreme Court, this court will not second-guess appellate counsel's strategy and tactics in seeking to obtain a reversal based on the playing of the video recording.

{¶ 12} Finally, Conner has not established prejudice. In its opinion, this court repeatedly noted there was overwhelming evidence that Conner killed Woodard. Specifically, in regard to the playing of the interview, this court stated that the trial court instructed the jury not to consider the recording as substantive evidence, but only for impeachment purposes. "We have no basis to find that the jury did not follow the court's instructions, especially in light of all of the evidence outlined previously in our opinion." *Conner*, 8th Dist. Cuyahoga No. 99557, 2014–Ohio–601, ¶ 73. The court indicated that with the curative instruction the interview did not play a causal role in the conviction. Suppressing the interview ab initio would not have changed the result of the trial.

*Id*. at *2–3.

Conner's second argument was equally unsuccessful with the Ohio Court of Appeals. In addressing this argument, the court stated:

{¶ 13} Conner's second argument is that appellate counsel should have argued

35

prosecutorial misconduct in proffering perjured testimony and improperly characterizing some of the witnesses as "lying felons" during closing argument. Conner endeavors to characterize inconsistencies in Deandre Stephens's testimony as peured evidence. The prosecutor called Stephens as a witness, and when Stephens seemed evasive in answering, the judge granted the prosecutor's motion to treat him as a hostile witness. Conner first focuses on an exchange in which the prosecutor asked Stephens whether Conner had almost run over him when everybody was running around the parking lot. The prosecutor apparently was seeking an answer consistent with Stephens's interview with the detective that Conner probably could have run him over. Instead, Stephens testified there were so many people running into each other and bumping into each other that Conner probably could have almost run him over, but Stephens did not know if Conner had done that and that he did not see Conner in the parking lot. Next, the prosecutor asked Stephens if he knew whether Conner had a gun that night. Stephens said, "No." The prosecutor then tried to impeach him with the interview with the detective in which Stephens said "No. I do not know." It is difficult to discern how these inconsistencies amount to perjury, much less how this testimony prejudiced Conner. It is understandable how appellate counsel in the exercise of professional judgment could decide not to argue this point. Finally, appellate counsel did argue prosecutorial misconduct in characterizing some of the witnesses as "lying felons." Thus, Conner's argument is unpersuasive.

*Id*. at *3.

Conner has not shown that the resolution of his ineffective assistance of appellate counsel argument by the Ohio Court of Appeals was contrary to, or involved an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412–13. The Ohio Court of Appeals examined Conner's claim under the *Strickland* and *Jones* standards. In applying these standards, the court of appeals found the arguments unpersuasive. The analysis is reasonable. Therefore, Conner is not entitled to habeas corpus relief on his seventh argument.

### CONCLUSION AND RECOMMENDATION

Accordingly, the undersigned recommends that the petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254, be dismissed.

s/James R. Knepp II
United States Magistrate Judge

36

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time *WAIVES* the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981).